**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LAURIE EXBY-STOLLEY,

    Plaintiff - Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS, WELD COUNTY,
COLORADO,

    Defendant - Appellee.

No. 16-1412

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:13-CV-01395-WYD-NYW)**
_____

Jason B. Wesoky (Bruce G. Smith, with him on the briefs), Darling Milligan PC, Denver, Colorado, for Plaintiff-Appellant.

Alan Epstein (Thomas J. Lyons, Mark S. Ratner, and Matthew J. Hegarty, with him on the brief), Hall & Evans, L.L.C., Denver, Colorado, for Defendant-Appellee.

_____

Before **HARTZ**, **KELLY**, and **HOLMES**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiff Laurie Exby-Stolley sued her former employer, the Board of County Commissioners of Weld County, Colorado (the County), under the Americans with Disabilities Act (ADA) in the United States District Court for the District of Colorado. She alleged that the County had failed to accommodate her disability, resulting in the loss of her job. The jury returned a verdict for the County. She appeals, claiming three errors in her trial: (1) the district court improperly instructed the jury that she needed to prove she had suffered an adverse employment action; (2) the district court refused to instruct the jury on a claim of constructive discharge or allow her to argue constructive discharge in closing argument; and (3) the district court misallocated the burden of proof in its undue-hardship jury instruction.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. First, an adverse employment action—that is, a materially adverse decision regarding "application procedures, . . . hiring, advancement, . . . discharge, . . . compensation, . . . training [or] other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a)—is an element of all discrimination claims under the ADA, including those based on the failure to accommodate a disability. Second, Plaintiff's request for a constructive-discharge instruction was untimely. And finally, any error in the undue-hardship instruction was harmless because the jury instruction was irrelevant to the ground on which the jury rejected her claim.

I.      BACKGROUND

Plaintiff worked as a health inspector for the County. Her job required her to inspect restaurants, bars, and other places that handle food, interview employees, and

2

observe safety practices. While on the job in late 2009, she broke her right arm. This required prolonged treatment, including two surgeries, the second of which was in November 2011. Because of her injury, she had to use makeshift devices to assist her in her tasks, such as lifting, moving, and opening objects, and she had to learn to write using her left hand. The inspections therefore took her longer than before, and she could not complete the number of inspections required of those in her position.

There are two rather different versions of efforts to accommodate these impairments: Plaintiff's version and the version presented by the County. We begin with Plaintiff's version. In March 2012 she received a poor performance evaluation because of various issues, including being behind in her work. To explain her difficulty, she spoke to her two supervisors, Sara Evans and Deb Adamson. Adamson said she could not modify Plaintiff's workload without an evaluation from her doctor, so Plaintiff, worried about her job, went to her worker's-compensation doctor. The doctor prepared a report setting forth restrictions on her activity and sent it to Michelle Raimer, a human-resources analyst for the County. After reviewing the doctor's report, Adamson asked Plaintiff for a list of physical activities that had been a problem for her. Plaintiff requested a meeting with someone from human resources to discuss accommodations so that she could keep her job, and she then met with Adamson and Raimer. At the meeting Raimer said that human resources had never come up with accommodations for someone in Plaintiff's position. Raimer then arranged for Plaintiff to begin working in April at a part-time office job, which Plaintiff understood would be a temporary assignment. Plaintiff did not like the work. In May, Trevor Jiricek (to whom Evans and Adamson

3

reported) asked her why she simply did not go on disability. Jiricek expressed anger when she said that she did not want to go on disability.

Plaintiff returned to her worker's-compensation physician on June 6. On that visit he established what her permanent restrictions would be. Plaintiff requested another meeting with Raimer and Adamson to discuss accommodations. The meeting was held on June 19. Attending were Plaintiff, Adamson, Jiricek, and a physician. Plaintiff suggested various accommodations at the meeting, but her suggestions were rejected, and the others did not offer her alternative accommodations. As she and Jiricek were leaving the meeting he asked her if she wanted to write a letter of resignation herself or have him do it, and she felt that she was being told to resign. The two of them then went to Raimer's office, where they discussed when her last day of work would be. They looked at job openings with the County, but there was nothing besides janitorial work that she was qualified for. Raimer raised the possibility of long-term disability, but that would not have allowed Plaintiff to return to her job without reapplying if she recovered. Jiricek then left and Raimer provided some paperwork to Plaintiff. On June 21, Plaintiff sent an email to all her colleagues informing them that she would no longer be working for the County effective June 29. The email included the sentence, "After a final evaluation with the physician and meeting with management it is apparent I am no longer able to perform the duties required in [my] job description." Supp. App. at 158.

Raimer had a different account of what happened before the June 19 meeting. She testified that before Plaintiff saw her worker's-compensation physician in March 2012, she had complained to Adamson about pain she was suffering when performing her

4

duties and that Adamson had requested Plaintiff to prepare a list of the problematic duties so they could try to find a solution. Plaintiff would also call Raimer about her pain, and Raimer similarly asked to have information about specific tasks so she could be helpful. When Raimer received the physician's report, she discussed the matter with Adamson and tried to come up with ideas, such as reducing Plaintiff's shift or her time in the field performing duties that caused pain. Adamson and Raimer then met with Plaintiff. After discussing some alternatives, Raimer suggested working half-time in the office. Such a temporary modified duty required the employee's consent, and Plaintiff agreed. Raimer kept informed about how Plaintiff was doing, but Plaintiff did not request any further accommodations. Plaintiff did, however, raise a question about what would happen if she received permanent restrictions from the doctor, and Raimer responded that they would have to see if there were any such restrictions and what they were.

Jiricek testified about the June 19 meeting attended by Plaintiff, Adamson, and a County physician. According to his testimony, Plaintiff requested that a new position be created for her by piecing together from her job and other positions various tasks that she could perform. But he told her that other employees were already doing the duties of the new job she suggested for herself, and that it would not be fair or workable to take lighter tasks from her fellow employees to cobble together a new position for her. As he understood her response, she said in essence that if the County "couldn't provide her that very specific job, that she couldn't do the job." Aplt. App., Vol. IV at 835. He was "absolutely surprised" at her response. *Id.* at 836. He met with her again about 20 minutes after the meeting to ask what she had meant, and she indicated that she was

5

resigning. So he asked her if she needed help writing her resignation letter, but she declined his offer.

About two hours later, Jiricek and Plaintiff went to speak with Raimer. Jiricek testified that he did not recall any discussion of resignation at the meeting. He said they discussed accommodations, retraining, and other possible positions for Plaintiff; he did not stay for the whole meeting. Raimer testified that they discussed accommodating Plaintiff in her present position, finding other positions for her, and the availability of disability insurance. She showed Plaintiff a few jobs that were currently available, and asked about the tasks of Plaintiff's temporary part-time assignment. Although no concrete decisions were reached in the meeting, Raimer viewed the meeting as part of an interactive process to explore means of accommodating Plaintiff. Because finding a way to accommodate an employee in her present position can take six to eight months, Raimer did not expect this meeting to conclude the search for a reasonable accommodation. Rather, if Plaintiff had not resigned, Raimer would have continued to pursue ideas for accommodating her in her current position and to look for an appropriate job reassignment with the County. Plaintiff's resignation letter a few days later surprised Raimer.

Patricia Russell, the head of the County's Human Resources Department, was not at the meeting. But she testified that at the time of Plaintiff's resignation, the County was far from terminating her, a process that includes a determination by management, notice to the employee, and a chance for the employee to respond, as well as several appeals options. Not one of these actions had been taken. Instead, Russell testified:

6

We were still thinking we were in the interactive process . . . . We were still talking to the department to figure out what accommodations could be made. . . . [W]hat accommodations could we make in the county, in another department, other positions coming open where we could place her . . . and she could be successful. What did the employee want to do. . . . We did not have those discussions. When she resigned, . . . we stopped that process because she was leaving.

Trial Tr. 5, ECF No. 241 (Jan. 24, 2017).

Plaintiff filed suit on May 30, 2013. Her amended complaint (the operative pleading in this case) alleged that the County violated the ADA by failing to reasonably accommodate her disability, failing to engage in the ADA-required interactive process to find an accommodation, and terminating her because her physical restrictions did not allow her to perform all the duties that her original job description included. After a five-day trial the jury, in answer to special interrogatories, found that Plaintiff had "proven by a preponderance of the evidence that she had a disability as defined in the instructions, at the time of the employment actions in question" and that "she is a qualified individual with a disability, as defined in the instructions . . . ." Aplt. App., Vol. II at 419 (answer to special interrogatories 1 and 2 on jury-verdict form). But judgment was entered for the County because the jury further found that Plaintiff had not "proven by a preponderance of the evidence that she was [discharged from employment][not promoted][or other adverse action] by [the County] . . . ." *Id.* (answer to special

interrogatory 3) (brackets in original).[1]  The County had argued to the jury that placement of Plaintiff on temporary half-time office duty was not an adverse employment action because she fully agreed with the change and lost no pay (the reduction was offset by workers' compensation payments); and the County took no later action against her because she voluntarily resigned.

## II.    DISCUSSION

### A.    Adverse Employment Action

On appeal Plaintiff first contends that the district court erred in instructing the jury that she had to prove she had suffered an adverse employment action.  "We review a district court's decision to give a particular jury instruction for abuse of discretion, but we

---

[1]  Having found for the County in interrogatory 3, the jury did not need to address the following four interrogatories:

4.    Has Plaintiff proven by a preponderance of the evidence that her disability was a substantial or motivating factor that prompted [the County] to take that action? . . . .

5.    Has [the County] proven by a preponderance of the evidence that providing a reasonable accommodation would impose any undue hardship on the operation of [the County's] business? . . .

6.    Has [the County] proven by a preponderance of the evidence that it made a good faith effort to provide reasonable accommodations for the Plaintiff's disability? . . . .

7.    Do you find that Plaintiff should be awarded compensatory damages for emotional distress or mental anguish she experienced as a result of [the County's] failure to accommodate her disability? . . . . If your answer to question 7 is "yes," in what amount?

Aplt. App., Vol. II at 419–20 (special interrogatories 4–7).

8

review de novo legal objections to the jury instructions." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012) (internal quotation marks omitted).

We reject Plaintiff's contention because an adverse employment action is an element of a failure-to-accommodate claim. The contrary view appears to derive from two errors: (1) failure to consider the statutory language requiring an adverse employment action and (2) an incorrect belief that the adverse-employment-action requirement is not mandated by statute but is solely a creature of the framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for proof by circumstantial evidence of employment discrimination under Title VII and now applied to other employment-discrimination statutes. We begin by discussing the meaning of *adverse employment action* and then describe its role in the *McDonnell Douglas* framework.

> The opening provision of the ADA states the general rule:
>
> No covered entity shall [1] *discriminate against a qualified individual on the basis of disability* [2] *in regard to* job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, *and other terms, conditions, and privileges of employment* . . . .

42 U.S.C. § 12112(a) (emphasis added). The important feature of this provision for present purposes is that it is not enough to establish only "discrimination . . . on the basis of disability." The discrimination must be "in regard to" certain features of employment. The in-regard-to clause—which, as we shall see, applies to failure-to-accommodate claims—is what requires proof of an adverse employment action.

9

True, the language "adverse employment action" does not appear in the ADA. This terminology, however, is well established in judicial opinions. The language of § 12112(a) tracks similar language from Title VII of the 1964 Civil Rights Acts, which prohibits employers from discriminating on the basis of race, color, sex, religion, or national origin "with respect to [an individual's] *compensation, terms, conditions, or privileges of employment*." 42 U.S.C. § 2000e-2(a) (emphasis added). In Title VII cases, when federal courts speak of an "adverse employment action," they are referring to this quoted element of a discrimination claim. As the Seventh Circuit said in *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (Posner, J.), "'[A]dverse employment action' . . . is judicial shorthand (the term does not appear in the statutes themselves) for the fact that [employment-discrimination] statutes require the plaintiff to prove that the employer's action of which he is complaining altered the terms or conditions of his employment." Other circuits have adopted the same shorthand. *See Bergeron v. Cabral*, 560 F.3d 1, 7–8 (1st Cir. 2009) ("The term 'adverse employment action' arose in the Title VII context as a shorthand for the statutory requirement that a plaintiff show an alteration in the material terms or conditions of his employment."); *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) ("An adverse employment action is a materially adverse change in the terms and conditions of employment." (emphasis and internal quotation marks omitted)); *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("[A]n adverse employment action [is] an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." (internal quotation marks omitted)); *Thompson v. City of Waco*, 764 F.3d

10

500, 503 (5th Cir. 2014) ("To establish a discrimination claim under Title VII . . . , a plaintiff must prove that he or she was subject to an 'adverse employment action'—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment."); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) ("An adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions." (internal quotation marks omitted)); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) ("[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." (ellipsis and internal quotation marks omitted)); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013) ("An adverse employment action is a serious and material change in the terms, conditions, or privileges of employment." (internal quotation marks omitted)).[2]

---

[2] We note that the Supreme Court made the connection between *adverse employment action* and the statutory terms-and-conditions-of-employment language when it construed the retaliation provision of Title VII, which does not include terms-and-conditions language found in the antidiscrimination provisions of both Title VII and the ADA. *See* 42 U.S.C. § 2000e-3. In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60 (2006), the circuit court had ruled that the plaintiff in a retaliatory-action claim must prove an adverse employment action. The Court rejected that requirement, relying on the absence of terms-and-conditions language in Title VII's retaliation provision. *See id.* at 61–63. The Court held that a retaliation claim could be based on any action, whether or not significant to the employee's job, that "a reasonable employee would have found [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted).

11

The terms-and-conditions-of-employment language applies to failure-to-accommodate claims under the ADA. This is clear from the language of § 12112. We again quote subsection (a) but also include the failure-to-accommodate language of subsection (b):

> (a) No covered entity shall [1] *discriminate against a qualified individual on the basis of disability* [2] *in regard to* job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, *and other terms, conditions, and privileges of employment.*

> (b) As used in [§ 12112(a)], the term *"discriminate against a qualified individual on the basis of disability" includes—*

> . . . .

> (5)(A) *not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

(emphasis added). Subparagraph (b)(5)(A) is satisfied if a qualified disabled employee requested an accommodation and the employer, instead of properly engaging in the interactive process required in such circumstances, did not reasonably respond. *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (describing requirement of reasonable accommodation and the interactive process). What subparagraph (b)(5)(A) and the other provisions in subsection (b) do is to provide disabled persons with a cause of action even when they have not shown that the employer "discriminate[d] against a qualified individual on the basis of disability," as otherwise required by § 12112(a). That is, the employee need not show that she was treated worse

12

than abled persons. For example, a disabled person may have a claim for failure to accommodate a disability even if the employer also failed to accommodate problems encountered by abled employees. It is important to point out, however, that a failure-to-accommodate claim is still a "discrimination" claim under the ADA. Such a claim comes under § 12112, whose title is "Discrimination." *See, e.g., US Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) ("[T]he ADA says that 'discrimination' includes an employer's '*not making reasonable accommodations . . . .*'").

But satisfying subparagraph (b)(5)(A) is not the only thing necessary to establish an ADA discrimination claim based on a failure to accommodate. Subsection (b) begins, "As used in [§ 12112(a)], the term '*discriminate against a qualified individual on the basis of disability*' *includes –*" and then lists several alternatives, including a failure to accommodate. (Emphasis added). That, however, is as far as subsection (b) goes. It does not say that the language "discriminate against a qualified individual on the basis of disability *in regard to job application procedures, . . . and other terms, conditions, and privileges of employment*" includes failure to accommodate under subparagraph (b)(5)(A). (Emphasis added). The emphasized language does not appear in subsection (b), so proof of a failure to accommodate does not automatically satisfy the terms-and-conditions language. Even after proof of a failure to accommodate, there remains the requirement that the discrimination be "in regard to job application procedures, . . . [or] other terms, conditions, or privileges of employment." That is, the employee still needs to prove this component of an ADA discrimination claim based on a failure to accommodate.

13

It is natural to use the same shorthand—adverse employment action—for this statutory language in the ADA as is used for like language in Title VII, and other circuits have done so. In an ADA failure-to-accommodate case, the Eighth Circuit held that the plaintiff "did not experience an *adverse employment action* because accepting the cashier position did not materially change the *terms or conditions* of her employment." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (brackets and internal quotation marks omitted) (emphasis added). Similarly, the D.C. Circuit wrote: "As the language of § 12112(a) makes clear, for discrimination (including denial of reasonable accommodation) to be actionable, it must occur *in regard to some adverse personnel decision or other term or condition of employment*." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997) (additional emphasis added).[3]

Those who fail to recognize that the adverse-employment-action requirement is founded in statutory language that applies to all ADA discrimination claims may be confused by the fact that the *McDonnell Douglas* framework must be modified to apply to failure-to-accommodate claims. It is therefore worth explaining why this modification has nothing to do with the adverse-employment-action requirement. In *McDonnell Douglas* the Supreme Court considered how to prove a Title VII racial-discrimination

---

[3] We too have adopted the use of the term *adverse employment action* in ADA cases (although not in the failure-to-accommodate context) when discussing the meaning of § 12112(a), although without tying the requirement to specific statutory language. *See Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001) (requiring plaintiff to show that he suffered an adverse employment action as an element of his claim under the ADA).

14

claim with circumstantial evidence. Pertinent here, it said that a plaintiff could "establish[] a prima facie case of racial discrimination . . . by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802. The Court went on to say that proof of a prima facie case shifts the burden to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection," *id.*; but the employee could overcome this defense by showing the proffered reason to be a pretext, *see id.* at 804. The specific test set forth in *McDonnell Douglas* obviously can apply only to discriminatory failures to hire. Courts have therefore modified the test to apply to other circumstances (such as firing, failure to promote, etc.), often by saying simply that the employer took an "adverse employment action" (other than failure to hire). *See*, *e.g.*, *Orr v. City of Albuquerque*, 417 F.3d 1144, 1147, 1149 (10th Cir. 2005) (reciting adverse employment action as element of prima facie case under Title VII when plaintiffs claimed gender disparity in granting compensatory time for pregnancy-related absences); *Watts v. City of Norman*, 270 F.3d 1288, 1292 (10th Cir. 2001) (reciting adverse employment action as element of prima facie case under Title VII when plaintiff claimed he was demoted due to race); *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 531 (10th Cir. 1998) (reciting adverse employment action as element of prima facie case under Age Discrimination in Employment Act and Title VII when plaintiff complained of involuntary transfer).

15

Again, the specific framework set forth in *McDonnell Douglas* is to enable a member of a protected class (race, gender, disability, etc.) to establish through circumstantial evidence that he or she has a valid claim under an employment-discrimination statute based on the failure to treat the plaintiff as well as those not in the plaintiff's protected class. As noted above, for failure-to-accommodate claims it is not necessary to show that disabled persons are treated worse than abled ones. But that hardly means that *none* of the requirements set forth in the *McDonnell Douglas* framework apply to failure-to-accommodate claims. After all, the *McDonnell Douglas* framework enables the plaintiff to prove her claim in its entirety, not just that she was treated worse than people not in her protected class. A prima facie case in that framework establishes not only that the plaintiff was treated worse than those not in the protected class but also that the treatment was with respect to the "terms, conditions, or privileges of employment." 42 U.S.C. §2000e–2(a)(1). The reason courts have included adverse employment action, as opposed to just "discriminatory action," as an element under the *McDonnell Douglas* framework is not to prove discriminatory animus. The reason to require that the discriminatory act be an "adverse employment action" is that not every discriminatory act by an employer entitles an employee to redress under the employment-discrimination statutes. The discriminatory act must be in regard to, or with respect to, the terms or conditions of employment.

In *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir. 1999), Judge Selya recognized that the absence of the need to use the *McDonnell Douglas* framework to prove discriminatory intent in failure-to-accommodate claims does not affect the

16

adverse-employment-action requirement. First, he noted that "[i]n order to facilitate inquiries into whether an employer's adverse employment decision was motivated by an employee's disability, courts generally use the *McDonnell Douglas* burden-shifting scheme." *Id.* at 264. But, he pointed out, this discriminatory motivation is not required to establish a failure-to-accommodate claim: "[U]nder the ADA, the term 'discriminate' includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Id.* (ellipsis, brackets, and internal quotation marks omitted). Then he went on to say:

> **Unlike other enumerated constructions of "discriminate," this construction does not *require* that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability"—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible.** Hence, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business.

*Id.* (We have bolded language that was quoted in *Punt v. Kelly Services*, 862 F.3d 1040, 1048 (10th Cir. 2017).) Judge Selya concluded, "It follows inexorably that the *McDonnell Douglas* scheme is inapposite in respect to such claims." *Id.* But that did not mean that the plaintiff was freed from the requirement of showing that the failure to accommodate was "in regard to job application procedures, . . . [or]

17

other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

The next paragraph of the opinion stated:

> *To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significantly probative evidence* that he is a qualified individual with a disability within the meaning of the applicable statute; that he works (or worked) for an employer whom the ADA covers; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and *that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.*

*Id.*  (emphasis added).

The same distinction is made in Kevin W. Williams, *The Reasonable Accommodation Difference:  The Effect of Applying the Burden Shifting Frameworks Developed under Title VII in Disparate Treatment Cases to Claims Brought under Title I of the Americans with Disabilities Act,* 18 Berkeley J. Emp. & Lab. L. 98, 151–59 (1997). The thrust of the article is that the *McDonnell Douglas* burden-shifting framework does not work for failure-to-accommodate claims.  Under that framework, after the employee establishes a prima facie case, the employer's burden is only to articulate a nondiscriminatory reason (one not based, for example, on the employee's disability) for the action taken against the employee; then the employee must show that that reason is pretextual.  But in the failure-to-accommodate context the employer's reason for not accommodating the employee necessarily considered the employee's disability.  In other words, unlike the typical case, the connection between the employer's action and the employee's disability is necessarily established.  *See id.* at 152 ("Unlike the situation

18

where an employer asserts that its reason for taking some adverse employment action against the plaintiff was completely unrelated to the plaintiff's disability, in a claim based on a failure to reasonably accommodate, the causal relationship between the adverse action and the disability is already established.")[4]  Consequently, argues the article, in failure-to-accommodate cases the employer should bear the burden of persuasion, not just a burden of production, with respect to whether the employer could reasonably accommodate the employee's disability.  But the author nevertheless assumes that the failure to accommodate must be in connection with an adverse employment action (or, in the author's terminology, an "adverse employment decision").  *See*, *e.g., id.* at 102 (the author's "discussion [in Part III of the article] focuses on the usefulness of the framework when the solitary issue to be determined is whether the employer made its *adverse employment decision* either because of the employee's disability or because of a reason wholly unrelated to disability" (emphasis added)); *id.* at 151 ("The duty to provide reasonable accommodation is broad and requires that before an employer takes adverse action against an employee who has requested an accommodation, it must consider how it can reasonably accommodate the employee."  (Footnote omitted)); *id*. at 155 ("By requiring employers and employees to engage in the interactive process, the ADA

---

[4]  The dissent quotes this sentence from the article as supporting the proposition that an adverse employment action is not necessary for a failure-to-accommodate claim.  *See* Dissent at 5.  But if anything, the passage appears to assume that there must be an adverse action and is simply pointing out that the connection of that action to the employee's disability is established by the very nature of a failure-to-accommodate claim.

19

ensures that all of the possibilities will have been at least considered before any adverse employment decision is made.").

In short, once we recognize that to require an adverse employment action is simply to require that the discrimination be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), it is evident that the requirement applies to every discrimination claim under the ADA, including those based on failure to make reasonable accommodations.

No Tenth Circuit precedent is to the contrary. For the dissent to say otherwise is to bind panels of this court to dicta in earlier published opinions—indeed, dicta of the weakest sort. One can look in vain for a published opinion of this court that discusses an argument by a party that an adverse employment action is or is not required to establish a claim based on a failure to accommodate where the answer to that question would have had an effect on the outcome of the appeal. In fact, not a single published opinion has even mentioned that the question was raised by a party, nor is there a single published opinion in which the answer to the question would have affected the outcome of the appeal. As this court recently said, "Dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case at hand." *United States v. Titties*, 852 F.3d 1257, 1273 (10th Cir. 2017) (brackets and internal quotation marks omitted); *see generally* Garner, The Law of Judicial Precedent ch. 4 at 44 ("The *holding* of an appellate court constitutes the precedent, as a point necessarily decided. *Dicta* do not: they are merely remarks made in

20

the course of a decision but not essential to the reasoning behind that decision."). "A panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's dicta." *Titties*, 852 F.3d at 1273.

There are sound jurisprudential reasons for not binding a later panel to dicta: "'One is that the passage was unnecessary to the outcome of the earlier case and therefore perhaps not as fully considered as it would have been if it were essential to the outcome.'" Garner at 66 (quoting *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988)). "'A closely related reason is that the passage was not an integral part of the earlier opinion—it can be sloughed off without damaging the analytical structure of the opinion, and so it was a redundant part of that opinion and, again, may not have been fully considered.'" *Id.* A third "'is that the passage was not grounded in the facts of the case and the judges may therefore have lacked an adequate experiential basis for it,'" *id.* and "'another . . . [is] that the issue addressed in the passage was not presented as an issue, hence was not refined by the fires of adversary presentation,'" *id.* "'All these are reasons for thinking that a particular passage was not a fully measured judicial pronouncement, that it was not likely to be relied on by readers, and indeed that it may not have been part of the decision that resolved the case or controversy on which the court's jurisdiction depended (if a federal court).'" *Id.* at 66–67 (quoting *Crawley*, 837 F.2d at 293). The essential features of dicta and the reasons we are not bound by dicta are so fundamental that we regularly do not even bother to cite authority on the matter. *See, e.g., Dish Network LLC v. Ray*, 17-1013 at 14 n.3 (rejecting contention that statement in prior decision was binding precedent, saying: "[W]e never addressed

21

whether incorporation of the Commercial Arbitration Rules of the AAA added clear and unmistakable evidence of delegation, and there is no indication that either party raised this as an issue. [The prior opinion] is therefore not contrary to our holding here.")

In this light, it is easy to see why the opinions of this court relied upon by Plaintiff do not establish precedent that an adverse employment action is not required to establish an ADA claim based on a failure to accommodate. To begin with, as previously noted, none of the opinions indicated that the issue had been raised by a party and none discussed the merits of the issue. This should not be surprising because resolution of the issue would have made no difference to the appeal. In *Bartee*, 374 F.3d at 910, it was undisputed that the employer terminated the plaintiff, which is a paradigmatic adverse employment action. Whether there was an adverse employment action was hardly at issue. *See also Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1254 (10th Cir. 2001) (undisputed that plaintiff was terminated). In *Punt v. Kelly Services*, 862 F.3d 1040, 1050 (10th Cir. 2017), we determined that the plaintiff did not request a plausibly reasonable accommodation, so there was no need to consider whether the plaintiff had suffered an adverse employment action; the claim was doomed anyway. Similarly, in *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011), the plaintiff's claim of discrimination under § 12112(b)(5)(A) for failure to accommodate failed because the plaintiff did not adequately request an accommodation, *see id.* at 1050. And in *Smith v. Midland Brake*, 180 F.3d 1154, 1179 (10th Cir. 1999) (en banc), we reversed a grant of summary judgment in favor of the defendant because there was a genuine dispute whether the plaintiff had sufficiently invoked the interactive process for reasonable

22

accommodations, and we remanded to the district court for further proceedings. Again, there was no reason for us to consider whether there was an adverse employment action in that case.[5] *See also Sanchez v. Vilsack*, 695 F.3d 1174, 1179–80 (10th Cir. 2012) (remanding to district court after reversing summary judgment on question of whether plaintiff was disabled).

The dissent appears to suggest that there is something special when this court describes the parameters of a cause of action. It points to occasions in which we have set forth the elements of a failure to accommodate and contends that silence about an adverse-employment-action requirement is "deafening." Dissent at 3. Of course, it may well have been that what we were doing is simply setting forth the failure-to-accommodate requirements of § 12112(b)(5)(A), not all the elements of an ADA claim based on failure to accommodate. That would have resolved everything that was relevant

_____

[5] The issue of whether there was an adverse-employment-action requirement simply was not considered by the court. As we stated:

> In this en banc appeal, we are required to answer two questions concerning the [ADA]. First, whether an employee can be a "qualified individual with a disability" when that employee is unable to perform the essential functions of his or her present job, regardless of the level of accommodation offered, but could perform the essential functions of other available jobs within the company with or without a reasonable accommodation. The answer to that question, we find, is yes. Second, if a person is a "qualified individual with a disability" and a reasonable accommodation is not available to enable that employee to perform the essential functions of his or her existing job, what is the scope of the employer's obligation to offer that employee a reassignment job?

*Id*. at 1159 (footnote omitted).

23

to the appeals in those cases. But in any event, silence—the complete failure even to discuss an issue, such as whether an adverse employment action is a required element of the claim—is not a holding, however thundering, particularly when no party has raised the issue.

To say that a statement in an opinion is nonbinding dictum is not to denigrate the author of the dictum or the panel that joined. When a court utters dictum, it intends to assist in the development of the law and to give guidance to lawyers and the lower courts. Often it serves those purposes well. But experience has shown that dictum must be written with humility. When courts make statements not subjected to the focus and testing of the adversary process—the deliberative process that occurs when the issues are critical to the result, are argued by the parties, and are resolved with a reasoned explanation—they are more likely to overlook or improperly weigh important considerations. That is one reason why, for example, courts restrict their jurisdiction to cases and controversies and are hesitant to issue precedential opinions when the losing party is proceeding pro se. In none of the Tenth Circuit decisions relied on by the dissent were *any* of these conditions satisfied: whether an adverse employment action was an element of the claim would not have affected the result, there is no indication that the issue was argued, and the opinions offered no reasoning why an adverse employment action would not be an element.[6]

_____

[6] As for the dissent's suggestion that the failure to follow dicta in our prior opinions would confuse the bar and the lower courts, which would think that they could safely follow those dicta, *see* Dissent at 12, we note that the purported clarity of those dicta was

24

When we look outside this circuit, several other circuits have explicitly required an adverse employment action in failure-to-accommodate cases. *See Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 32 (1st Cir. 2011) ("To establish a [failure-to-accommodate] claim under the ADA, a plaintiff must prove three factors by a preponderance of the evidence: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the alleged disability."); *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 108 (2d Cir. 2001) ("[T]he *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action,

---

apparently not obvious to the district court in this case, which instructed the jury that an adverse employment action was indeed an element of Plaintiff's failure-to-accommodate claim. In particular, the district court could quite reasonably have relied on *C.R. England* as requiring an adverse employment action. The opinion states, "In order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an adverse employment action because of the disability." 644 F.3d at 1038 (further internal quotation marks omitted). Since a failure-to-accommodate claim is a claim of "discrimination," *see US Airways*, 535 U.S. at 396 ("[T]he ADA says that 'discrimination' includes an employer's not making reasonable accommodations" (emphasis and further internal quotation marks omitted)), one could infer that the adverse-employment-action requirement applies to failure-to-accommodate claims. The dissent argues that the *C.R. England* opinion "made clear" that the adverse-employment-action requirement was to be applied only to "claims predicated on a disparate-treatment theory." Dissent at 2. But that opinion never uses the term *disparate treatment*. Regardless of whether the opinion intended to make that distinction, a reader could be forgiven for not picking up on the point when the distinction was not proposed by any party, was not relevant to the result, and was never explained in the opinion. When dictum is implicit, rather than expressly stated, such problems can be expected.

must . . . exist for there to be liability."); *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999) ("[T]o state a prima facie case of 'failure to accommodate' disability discrimination, a plaintiff who has suffered an adverse employment action must show that: (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job; and (4) the disability caused the adverse employment action (a factor which is implied if not stated)." (citations omitted)), *abrogation on other grounds recognized by Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962–63 (7th Cir. 2010); *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003) ("To obtain relief under the ADA [for failure to accommodate], [the plaintiff] must show that he (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) suffered an adverse employment action as a result of the disability." (further internal quotation marks omitted)); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) ("To establish a prima facie case for failure to accommodate under the ADA, [the plaintiff] must show that (1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." (brackets and internal quotation marks omitted)); *Marshall*, 130 F.3d at 1099 ("As the language of § 12112(a) makes clear, for discrimination (including denial of reasonable accommodation) to be actionable, it must occur in regard to some adverse personnel decision or other term or condition of employment.").

Plaintiff cites only one published circuit opinion, and the dissent cites another, that explicitly rejected an adverse-employment-action requirement for a failure-to-accommodate claim. In *EEOC v. AutoZone, Inc.*, 630 F.3d 635 (7th Cir. 2010), a Seventh Circuit panel stated in a footnote that an adverse employment action is not a necessary element of a failure-to-accommodate claim under the ADA, *see id.* at 638 n.1. We are not persuaded. First, the statement appears to be dictum. As the court itself noted, "This misstep [the district court's requiring an adverse employment action] was not decisive for the court's judgment; we raise it only to alert the district court so that it may avoid proceeding down that same path on remand." *Id.* The district court had granted the employer summary judgment on the claim on the ground that the plaintiff was not disabled, and the circuit court reversed, holding that there was sufficient evidence of disability. *See id.* at 638, 644–45.

Second, the court ignored, without explanation, contrary statements by the same court. *See Foster*, 168 F.3d at 1032 ("[T]o state a prima facie case of 'failure to accommodate' disability discrimination, a plaintiff who has suffered an adverse employment action must show that: (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job; and (4) the disability caused the adverse employment action (a factor which is implied if not stated).").

Third, and most important, the footnote provides no analysis to support its statement that "[n]o adverse employment action is required to prove the failure to accommodate." *Autozone*, 630 F.3d at 638 n.1. And the authority it cites is irrelevant. The footnote's only "See" citation on the proposition is to *Bragdon v. Abbott*, 524 U.S.

27

624 (1998). But the claim in *Bragdon* was not employment discrimination. The plaintiff, who had been diagnosed with an HIV infection, sued her dentist for refusing to treat her, and her suit relied on 42 U.S.C. § 12182, not, as in our case, the *employment-discrimination* statute 42 U.S.C. § 12112. *See id.* at 629–30. It would have been startling if her claim required proof of an adverse employment action. And the page of *Bragdon* cited in the footnote addresses only the meaning of the statutory definition of disability. *See id.* at 631.

The footnote also cites two Seventh Circuit cases, stating: "see also *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir.2001) (describing and applying the same test for determining whether an individual is a qualified individual with a disability under the ADA); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437–40 (7th Cir.2000) (same)." The parentheticals to the two opinions are correct, but irrelevant to the issue. Neither opinion addressed whether an adverse employment action is an element of the claim. The most that could be said of the two opinions is that an adverse employment action was not included in the *explicitly incomplete* list of elements of a failure-to-accommodate claim stated in both opinions. *See Basith*, 241 F.3d at 927 ("In a reasonable accommodation case, like the present one, the plaintiff *must first show* that: 1) he was disabled; 2) his employer was aware of his disability; and 3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position." (emphasis added)); *Sears, Roebuck & Co.*, 233 F.3d at 437 ("[I]n order for a plaintiff to recover under the ADA for an employer's failure to reasonably accommodate, that plaintiff *must first show*: (1) that she was or is disabled as

28

defined by the Act, (2) that her employer was aware of the disability, and (3) that she was qualified for the position in question." (emphasis added)). The list of elements in the two cited opinions did not even include a requirement that the employer failed to reasonably accommodate the plaintiff.

In short, we do not think that the *AutoZone* footnote overrides the reasoning and authority that convinces us that an adverse employment action is an element of a failure-to-accommodate claim.

The other published circuit opinion stating that no adverse employment action is required for a failure-to-accommodate claim is *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014). The statement was pure dictum, because the failure-to-accommodate claim had been abandoned. *See id.* at 703. In any event, the only authority cited by the court in support of its statement was an unpublished opinion, *Bridges v. Department of Social Services*, 254 F.3d 71 (5th Cir. 2001) (unpublished), whose only supporting authority was a Fifth Circuit opinion that said, "[I]t is perhaps arguable that the failure to accommodate an employee standing alone may give rise to a claim under the ADA," *Loulseged v Akzo Nobel Inc.,* 178 F.3d 731, 734 (5th Cir. 1999). We are not

persuaded.[7, 8]

_____

[7]  Plaintiff cites a few other published opinions from fellow circuits that do not express an adverse-employment-action requirement as an element of a failure-to-accommodate claim under the ADA.  Several, however, are from circuits (the First and Seventh) that have stated the requirement in other opinions cited above.  And in all of them, as with the Tenth Circuit cases discussed above, whether there was an adverse employment action was not at issue.  Either the plaintiff was terminated (and thus plainly suffered an adverse employment action) or the plaintiff failed to satisfy other elements of the claim.  *See EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 131–34 (1st Cir. 2014) (employer  did not fail to reasonably accommodate plaintiff); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 379, 391 (4th Cir. 2001) (plaintiff was terminated and did not produce sufficient evidence that she was disabled); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015) (plaintiff was not a qualified individual with a disability); *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–50 (7th Cir. 2011) (plaintiff was terminated, and failed to show she was disabled); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 541, 546 (7th Cir. 2008) (plaintiff was terminated and the employer had reasonably accommodated her disability); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1257–60 (11th Cir. 2001) (plaintiff could not perform the essential functions of warehouse positions after an injury and the employer was not required to promote him to nonwarehouse position as a reasonable accommodation).

[8]  We also mention two other authorities cited by the dissent.  *See* Dissent at 6 & n.3.  One is the EEOC enforcement guidance.  U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship under The Americans With Disabilities Act (2002)*, https://www.eeoc.gov/policy/docs/ accommodation.html.  Although it discusses at length the meaning of the reasonable-accommodation requirement, it never purports to state all the elements of an ADA discrimination claim based on a failure to accommodate.  And there is nary a mention of adverse employment actions.  Given the authority noted above stating the requirement of an adverse employment action to prove an ADA discrimination claim based on a failure to accommodate, one would have expected the ADA to explain why those authorities are wrong if it really intended to express guidance on the matter.  Perhaps statements in the EEOC Guidance could be persuasive regarding the meaning of an antidiscrimination statute, but only if supported by some reasoning, not silence, however thundering.

The other authority is the following ambiguous statement in a treatise: "While a delay in satisfying an employee's request for reasonable accommodation might be cognizable as a failure-to-accommodate claim, that delay does not amount to a significant change in the plaintiff's employment status and, therefore, is not actionable as an adverse action supporting a discrimination claim."  1 *Disability Discrimination in the Workplace* § 2:13,

Having concluded that a failure-to-accommodate claim requires proof of an adverse employment action, we consider Plaintiff's suggestion that any failure to reasonably accommodate constitutes such an action.[9] The suggestion has some appeal. When we think of failure-to-accommodate claims, we ordinarily picture a scenario in which the employee has in fact suffered an adverse employment action. The typical failure-to-accommodate claim arises out of a failure to accommodate the employee to enable her to perform the essential functions of her job and her consequent termination because she cannot perform as required. But this is not the only possible setting for a failure-to-accommodate claim. In particular, there could be a failure to accommodate that does not result in termination and is not otherwise connected to an adverse employment action.[10]

---

Westlaw. The sole authority cited in support of that statement is the decision in *Pauling v. District of Columbia*, 286 F.Supp.3d 179 (D.D.C. 2017). In that case the court rejected the employee's claim that the employer failed to reasonably accommodate her over a lengthy period of time; it pointed out that she ultimately received the requested accommodations. The point being made in the treatise thus appears to be that a delay in accommodating a disabled employee is not in itself an adverse employment action necessary to support an ADA discrimination claim for failure to accommodate. (Presumably, a delay might create an adverse employment action if the employee was unpaid and not allowed to return to work pending the accommodation.) That point is consistent with our reasoning in this opinion.

[9] We note that if, as a factual matter, every failure to accommodate satisfied the requirements of an adverse employment action, it is unclear how a plaintiff would be prejudiced by an instruction requiring proof of an adverse employment action.

[10] One reason that the issue before us has never been squarely decided by a prior circuit opinion is that it is unlikely that an employee would pursue a failure-to-accommodate claim when there has been no adverse employment action. Certainly, Plaintiff here rested her hopes on the jury's belief that she had been fired or forced to resign.

Although we "liberally define[] the phrase 'adverse employment action,'" "we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Sanchez*, 164 F.3d at 532 (internal quotation marks omitted). What is merely a convenience is not a term, condition, or privilege of employment. Thus, in *Sanchez*, which considered a Title VII and age-discrimination case, we held that there was no adverse employment action when a teacher was transferred to another school with the same salary and benefits but merely a longer commute. *See id.* (We recognize, of course, that a change in job location for a disabled employee may be much more than an inconvenience.) And when she applied for a new position, her failure to be reassigned was not an adverse employment action because the salary and benefits would have been the same in the new position. *See id.* We have also held that it was not an adverse employment action to place an employee on the night shift because a different shift was not a significant change in her duties and her salary and job classification remained the same. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 636 (10th Cir. 2012); *see also Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224– 25 (10th Cir. 2006) (placing employee on a professional improvement plan or issuing a formal warning does not constitute an adverse employment action unless it puts the employee immediately at risk of termination or affects salary or status), *abrogation on other grounds recognized by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012). To be sure, every case will turn on its specific facts. But our precedents would suggest, for example, that failure to accommodate a wheelchair-bound employee by

moving her office a few feet closer to the entrance may not be an adverse employment action if requiring the employee to travel the extra distance is a mere inconvenience.

In this case the County argued to the jury that Plaintiff suffered no adverse employment action because it did not do anything negative to her. Because of her physical limitations, it had given her a part-time office job with the same pay (when worker's-compensation benefits are included). When she asked for the County to create a new position for her, it denied her request but, according to testimony it presented, it did not fire her or make any other changes in her employment status. And County employees testified that they were planning to continue to look for ways to accommodate her. We are not willing to say in these circumstances that an employer's failure to immediately accommodate a request by a disabled employee is in itself an adverse employment action.

The only authority cited by Plaintiff in support of her claim that all failures to accommodate are adverse employment actions is *Colwell v. Rite Aid Corp*., 602 F.3d 495 (3d Cir. 2010). That opinion stated: "'Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities.'" *Id*. at 504 (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)). There may be some doubt whether the statement is asserting that *all* failures to make reasonable accommodations are *necessarily* adverse employment decisions. But if that is the thrust of the statement, the opinion contains no analysis of the statutory language or any other support for that proposition; and the point was irrelevant to the rest of the opinion. On the failure-to-accommodate claim, the court reversed summary

judgment for the employer simply on the ground that there was sufficient evidence of a failure to accommodate. As for the earlier authority, *Williams*, it too did not analyze the statutory language and it cited no supporting authority. Although it did cite authority that failure to make reasonable accommodations is a form of discrimination under the ADA, *see Williams*, *380* F.3d at 761, the opinion ignored the further statutory requirement that the discrimination must be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, [or] other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). That failure is understandable, however, because there was no real need for any deeper analysis to decide the case before it. In *Williams* there was a clear adverse employment action arising from the failure to make reasonable accommodations. The employer's response to the plaintiff's request for an accommodation was merely to "offer[] him an unpaid leave of absence and future employment should he recover." *Id*. at 771. Our view of the adverse-employment-action requirement is consistent with the holdings in *Colwell* and *Williams*. And to the extent that dictum in those opinions is contrary to our view, we are not persuaded.

### B. Constructive Discharge

Plaintiff proposed a jury instruction stating: "A constructive discharge occurs when the working conditions are so intolerable that a reasonable person in the plaintiff's position would feel compelled to resign." Aplt. App., Vol. I at 181. She complains that the district court rejected the proposed instruction and did not permit her to argue constructive discharge at trial. But before submitting the instruction, she had never

34

asserted that she had a constructive-discharge claim. Her amended complaint makes no mention of constructive discharge. Rather, it alleges that the ADA violations "culminated in [her] *discharge* from employment," *Id.* at 22 (emphasis added), and that "the County *fired* her," *id.* at 23 (emphasis added). Further, the term *constructive discharge* appears nowhere in the final pretrial order, in which Plaintiff simply asserted that she was terminated.

We have long recognized that a "district court has discretion to exclude from trial issues and claims not set forth in the pretrial order and to refuse to instruct the jury on matters beyond the scope of the pretrial order." *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir. 1995) (citation and internal quotation marks omitted). Because the purpose of a pretrial order is to clarify the nature of the disputes at issue, *see id.*, the parties must be able to rely on that order to plan their trial strategies. "[W]e review the district court's decision to refuse to instruct the jury on an issue it concludes is not raised in the pretrial order for an abuse of discretion." *Id.* We see no abuse of discretion in the court's refusal to permit Plaintiff to add a new theory of liability after settlement of the pretrial order. *See id.* (no abuse of discretion when court refused jury instruction on loss of chance of recovery when pretrial order asserted only "broad plain vanilla negligence").[11]

---

[11] Moreover, the district court permitted Plaintiff to convey the essence of the constructive-discharge claim to the jury. During a conference to settle instructions at the outset of trial, the district court said it would permit her to present evidence and argue that "deficiencies in the interactive process, regarding the accommodation that she believes she was entitled to, . . . caused her to leave the company," though "[n]ot in the context of [a] constructive discharge claim" but to support her failure-to-accommodate

35

### C. Undue-Hardship Jury Instructions

Plaintiff's final argument is that the district court improperly failed to instruct the jury that undue hardship is an affirmative defense and that the burden of persuasion lies with the County. But any error in that regard was harmless. There was no need for the jury to address the issue of undue hardship once it found that there was no adverse employment action. Our review of the issue would be required only if we had agreed with Plaintiff's failure-to-accommodate argument.

### III. CONCLUSION

The judgment of the district court is **AFFIRMED**.

---

claim. Aplt. App., Vol. III at 708. As the district court noted, this allowed her to counter the County's argument that she voluntarily resigned.

16-1412, *Exby-Stolley v. Board of Cty. Comm'rs, Weld Cty., Colo.*

**HOLMES**, J., dissenting.

I respectfully dissent. More specifically, I would hold that the district court erred in instructing the jury that there is an adverse-employment-action element embodied in a failure-to-accommodate claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213. I would therefore reverse the district court's judgment and remand for a new trial.[1]

At bottom, I rest this conclusion on our own controlling precedent. I respectfully reject the majority's assertion that reading an adverse-employment-action requirement into the ADA's failure-to-accommodate claim is not "contrary" to that precedent. Maj.

---

[1]       In reaching the conclusion that a reversal and remand is called for, I necessarily reject the County's suggestion that, even if the jury was wrongly instructed that an adverse employment action is an element of a failure-to-accommodate claim, the existence of that error "does not mean that [Ms. Exby-Stolley] was prejudiced," because the County "introduced evidence refuting [Ms. Exby-Stolley's] failure to accommodate theories." Aplee.'s Resp. Br. at 11. This argument is wholly unpersuasive because "[w]here an appellate court determines that the district court has given a legally erroneous jury instruction, the judgment must be reversed 'if the jury might have based its verdict on the erroneously given instruction.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003) (quoting *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002)). And this "'might have' threshold, as its language suggests, requires reversal 'even if that possibility [of the jury basing its verdict on the erroneous instruction] is very unlikely.'" *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1159 (10th Cir. 2012) (quoting *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1158 (10th Cir. 2008)). Here, the threshold is easily crossed: the jury returned a verdict for the County after indicating on the Verdict Form that Ms. Exby-Stolley had failed to prove that she was either "discharged from employment," "not promoted," or subjected to any "other adverse action" by the County. Aplt.'s App., Vol. II, at 419 (Verdict Form, dated Oct. 11, 2016). It therefore strains credulity to claim that the jury definitely did not base its verdict on the faulty instruction regarding an adverse employment action, when the lack of such an action was the very reason the jury decided in favor of the County.

Op. at 20.  The majority mistakenly "proceeds as though it were writing on *tabula rasa*" on this issue and, as such, "necessarily discards the contrary judgment arrived at" by our caselaw.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 389 (1974) (White, J., dissenting).  I decline to go along on this misguided and troubling trip.

Notably, in *E.E.O.C. v. C.R. England, Inc.* ("*C.R. England*"), 644 F.3d 1028 (10th Cir. 2011), we specifically distinguished between ADA discrimination claims predicated on a disparate-treatment theory and those that are predicated on a failure-to-accommodate theory, and we made clear through the content and structure of our analysis that—as between the two—it is only the former theory (i.e., disparate treatment) that includes an adverse-employment-action element.  *See id.* at 1038 & n.10, 1048–50.

More specifically, in our resolution of multiple distinct claims of ADA discrimination that the Equal Employment Opportunity Commission ("EEOC"), as well as the individual plaintiff, brought in *C.R. England*, we discussed the failure-to-accommodate theory of ADA discrimination approximately ten pages after we first referred to an adverse-employment-action element in discussing discrimination claims based on a disparate-treatment theory.[2]  *See id.* at 1038.  And, with our attention squarely

---

[2]     In *C.R. England*, we observed that "[i]n order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'"  644 F.3d at 1038 (footnote omitted) (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).  However, we did so only in explicating the standards for establishing ADA discrimination under a *disparate-treatment* theory.  In this regard, we specifically noted in a footnote (i.e., footnote 10)—which was directly appended to the sentence discussing the general need to demonstrate an adverse employment action—that the EEOC was predicating the

-2-

focused on the failure-to-accommodate claim, we uttered nary a word about an adverse-employment-action requirement. *See C.R. England*, 644 F.3d at 1048–50. Put another way, in resolving the failure-to-accommodate claim, the *C.R. England* panel was mute about an adverse-employment-action requirement. Instead, our analysis there centered solely on an employer's statutory and administrative obligations to reasonably accommodate an employee's disability. *See id.* And, more specifically, we stated there—with deafening silence regarding an adverse-employment-action requirement—that § 12112(b)(5)(A) "establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." *Id.* at 1048 (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001)).

The *C.R. England* panel's utter disregard of an adverse-employment-action requirement—because it was irrelevant in applying the standards defining the unlawfulness of an employer's failure to provide a reasonable accommodation—is an

---

discrimination claims at issue on 42 U.S.C. § 12112(b)(1), which "only prohibits 'limiting, segregating, or classifying a[n] . . . employee *in a way that adversely affects the opportunities or status* of such . . . employee because of the disability of such . . . employee.'" *Id.* at 1038 n.10 (alteration, omissions, and emphasis in original) (quoting § 12112(b)(1)); *see id.* (noting that this is the provision "upon which the EEOC's discrimination claim is based"). In other words, *C.R. England*'s reference there to an adverse-employment-action requirement was language that specifically and exclusively pertained to the ADA discrimination claims under a disparate-treatment theory—not such claims under a failure-to-accommodate theory. To be sure, the *C.R. England* panel subsequently did discuss an adverse-employment-action requirement in connection with an ADA retaliation claim. *See id.* at 1050–51. But, tellingly, the panel did *not* do so in setting forth the standards applicable to a failure-to-accommodate claim. *See id.* at 1048–49.

approach mirrored in our other failure-to-accommodate ADA cases. *See, e.g.*, *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) ("[A]ssuming the employee has provided notice to the employer of her disability, any limitations which result therefrom, and the accommodation she wishes to receive, then the employer's failure to provide a reasonable accommodation for the disability *establishes the required nexus* between the disability and the alleged discrimination without the need to delve into the employer's subjective motivations." (emphasis added)); *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.4 (10th Cir. 2004) (describing the "prima facie failure to accommodate claim" without any reference to an adverse-employment-action requirement, and, more specifically, observing that as to such a claim, the final element is not an adverse employment action like a termination but rather the employer's failure to reasonably accommodate the employee's disability); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1169, 1179 (10th Cir. 1999) (en banc) (noting that "[t]he unvarnished obligation derived from the statute is this: an employer *discriminates* against a qualified individual with a disability if the employer fails to offer a reasonable accommodation," and recounting the elements of an employee's prima facie case with no mention of an adverse-employment-action requirement).

In my view, the majority's misguided endeavor to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim primarily stems from its "confusion[,] . . . [in] failing to clearly differentiate between disparate treatment and failure to accommodate claims": the former require a showing of an

-4-

adverse employment action and the latter do not.  Megan I. Brennan, *Need I Prove More: Why an Adverse Employment Action Prong Has No Place in a Failure to Accommodate Disability Claim*, 36 HAMLINE L. REV. 497, 501 (2013); *see id.* at 499–500, 503 ("Confusion arises because the failure to accommodate is not 'discrimination' as the concept is traditionally understood. . . .  In a disparate treatment discrimination case under the ADA, an adverse employment action is one that causes a material change in the terms or conditions of employment. . . .  In short, adverse employment actions are needed to establish disparate treatment and retaliation claims under the ADA.  A failure to accommodate claim may be successful absent an adverse action." (footnotes omitted)); *see also* Kevin W. Williams, *The Reasonable Accommodation Difference: The Effect of Applying the Burden Shifting Frameworks Developed Under Title VII in Disparate Treatment Cases to Claims Brought Under Title I of the Americans with Disabilities Act*, 18 BERKELEY J. EMP. & LAB. L. 98, 152 (1997) ("[I]n a claim based on a failure to reasonably accommodate, the causal relationship between the adverse action and the disability is *already established*. The purpose of the plaintiff's prima facie case under these circumstances is not to raise a rebuttable presumption of discriminatory intent. Instead, the 'elusive factual question' to be determined is whether the employer *complied with its statutory obligation to provide reasonable accommodation*." (emphases added)); *cf.* 1 DISABILITY DISCRIMINATION IN THE WORKPLACE § 2:13, Westlaw (database updated Apr. 2018) ("While a delay in satisfying an employee's requests for a reasonable accommodation *might be cognizable* as a failure-to-accommodate claim, that delay does

not amount to a significant change in the plaintiff's employment status and, therefore, is not actionable as an adverse action supporting a discrimination claim." (emphasis added)).

This confusion is not shared by our controlling precedent.[3]  *See Punt*, 862 F.3d at 1048 ("There is at least one type of ADA claim, however, which does not require any evidence of discriminatory intent, whether direct or circumstantial: a failure-to-accommodate claim. . . . 'Unlike other enumerated constructions of "discriminate," this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability.  Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability"—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible.'" (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st

_____

[3]      And the confusion is certainly not shared by the EEOC—the federal agency charged with administering the ADA.  *See* Brennan, *supra*, at 505 ("The EEOC's regulations and Interpretive Guidance on the ADA also suggest an adverse employment action is not an element of a failure to accommodate claim."); *see also* U.S. Equal Emp. Opportunity Comm'n, ENF'T GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002), *available at* https://www.eeoc.gov/policy/docs/accommodation.html (stating under the heading "Burdens of Proof" that "[o]nce the plaintiff has shown that the accommodation s/he needs is 'reasonable,' the burden shifts to the defendant/employer to provide case-specific evidence proving that reasonable accommodation would cause an undue hardship in the particular circumstances," with deafening and telling silence regarding an adverse-employment-action requirement in plaintiff's burden of proof).

Cir. 1999))); *Smith*, 180 F.3d at 1178 n.12 ("The purpose of a burden shifting approach [first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] is a bit different in an ADA Failure to Accommodate case. In such a case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee *is* unlawful discrimination. *See* 42 U.S.C. § 12111(b)(5)(A) . . . . Thus, we use the burden-shifting mechanism, not to probe the *subjective intent* of the employer, but rather simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." (second emphasis added)). And this confusion of the majority likely explains why our controlling precedent has taken a different path than the majority has on the question of whether an adverse-employment-action requirement is part and parcel of an ADA failure-to-accommodate claim. Needless to say, however, the path of our precedent is binding.[4]

_____

[4]       And, though the majority strains mightily to paint a contrary picture, *see* Maj. Op. at 26–28, 29 & n.7, this is also the path followed in the decisions of several of our sister circuits. Beginning with *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635 (7th Cir. 2010), the majority's assertion of the "most important" point that supposedly discounts the significance of this case is flawed. Maj. Op. at 27. Specifically, the majority's contention that this case ostensibly "provides no analysis," *id.*, for its conclusion that no adverse-employment-action requirement is embodied in an ADA failure-to-accommodate claim bespeaks the same ADA-claims confusion that should be familiar to us now. That is, the majority's assertion stems from its failing to recognize that *AutoZone*'s determination is based on that panel's explicit awareness that an adverse-employment-action requirement is a feature of an ADA disparate-treatment claim, *not* a failure-to-accommodate claim. *See AutoZone*, 630 F.3d at 638 n.1 ("The district court correctly

identified the components of the reasonable accommodation test . . . . When applying the facts to the law, however, the court appears to have mistakenly applied an element of the disparate treatment test as part of its evaluation of reasonable accommodation. . . . No adverse employment action is required to prove a failure to accommodate." (citation omitted)). As we have seen, this distinction between the two types of ADA claims is critical. And, yet, it is a principal source of confusion in cases outside of our circuit—and also—underneath our own tent—in the majority's handicraft.

Going beyond *AutoZone*, the majority's strained efforts lead it to distinguish and discount other cases of our sister circuits principally on the basis that, in electing to omit an adverse-employment-action element from their recitation of the requisite elements of an ADA failure-to-accommodate claim, these cases have not actually come to grips with—or opined on—"whether there was an adverse employment action" component "at issue" in an ADA failure-to-accommodate claim. Maj. Op. at 29 n.7. As I point out with even greater force and certainty *infra* in discussing our own precedent, I am disinclined to conclude that the cadre of thoughtful federal judges who signed off on these circuit decisions would cavalierly tolerate the serious risk that, by omitting an ostensibly essential element (i.e., an adverse-employment-action element) from their listings of the requisite elements of a failure-to-accommodate claim, they would mislead the public and their lower courts regarding the state of the relevant ADA law. I am much more inclined to presume that, when the judges comprising these circuit panels omitted an adverse-employment-action element from their listings of requisite elements of a failure-to-accommodate claim, they intended to do so. That is, they intended to accurately represent to the public and their lower courts the nature of the relevant ADA law—*viz.*, an adverse-employment-action element is *not* part of an ADA failure-to-accommodate claim. Moreover, contrary to the majority's suggestion, some of these circuit panels did not just rely on a recitation of requisite elements, at least standing alone, to communicate their views regarding the absence of an adverse-employment-action element from an ADA failure-to-accommodate claim. *See, e.g.*, *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014) ("[W]e note that although their methods of proof are related, '[a] failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment.' . . . A failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action." (quoting *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agric. & Mech. Coll.*, 360 F. App'x. 562, 565 (5th Cir. 2010))); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) ("An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." (quoting 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. §

-8-

Consequently, I must respectfully reject the majority's divergent efforts.

In attempting to explain the unmistakable and telling absence of any mention of an adverse-employment-action element in our prior recitation of the requisite elements of a failure-to-accommodate claim, the majority says the following: "[I]t may well have been that what we were doing is simply setting forth the failure-to-accommodate requirements of § 12112(b)(5)(A), not all the elements of an ADA claim based on failure to accommodate." Maj. Op. at 23. I am not persuaded; nor should you be.

---

1630.9(a))). And this includes the cases from the Third Circuit, which reasons that an employer's failure to provide a reasonable accommodation is categorically, *without more*, a species of adverse employment action. *See, e.g.*, *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) ("Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities." (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004))); *Williams*, 380 F.3d at 771 (noting that "a failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA" and, as applied, that "[i]f a trier of fact concludes that Williams was disabled, however, it could also find that the failure to continue Williams' paid employment as a member of the radio or training unit was a failure to reasonably accommodate and accordingly *constituted an adverse employment action* under the ADA" (emphasis added)); *cf.* Brennan, *supra*, at 511 (though recognizing that courts like the Third Circuit do *not* require plaintiffs to establish an adverse employment action apart from an employer's failure to provide a reasonable accommodation, expressing disapproval of this approach because it imports the disparate-treatment concept of an adverse employment action into the realm of a failure-to-accommodate claim, which is "like trying to fit a square peg into a round hole"). Indeed, when federal district courts are included, one commentator has opined that, "[w]hen courts have been faced with the issue of whether an adverse employment action is needed to establish a prima facie failure to accommodate claim," "the majority" has concluded that it is "not" needed. Brennan, *supra*, at 507; *see id.* at 509 (noting that "the vast majority of courts correctly appreciate that the failure to accommodate is itself an act of discrimination that violates the ADA"). Therefore, we should not be persuaded by the majority's strained efforts to convince us that most courts subscribe to its (errant) view.

-9-

The majority need not speculate about what we *could have* been doing in our prior, binding cases; their plain text tells us what we *were* doing. For example, in *Smith*, we expressly described what the plaintiff must show "[t]o survive summary judgment on an ADA claim of failure to accommodate." 180 F.3d at 1179. Most significantly, in clear language, we stated the elements of an employee's "prima facie case." *Id.* That is, *Smith* detailed "all the elements of an ADA claim based on failure to accommodate," Maj. Op. at 23; it was not simply informing the reader that discrimination under the ADA includes a failure to accommodate, *see* § 12112(b)(5)(A).[5] If, as the majority would have it, an adverse-employment-action requirement is an essential element of a plaintiff's failure-to-accommodate ADA claim, it defies logic that the *Smith* panel would not have included that requirement in its statement of the prima facie case. But it did not do so. *See* 180 F.3d at 1179. And the reason is patent: under our controlling precedent, an adverse employment action is *not* a required element of an ADA failure-to-accommodate claim.[6]

_____

[5]     In our en banc decision in *Smith*, we "invok[ed] the familiar burden shifting approach" of *McDonnell Douglas*, recognizing that this "approach has been specifically adopted [sic] to ADA claims for failure reasonably to accommodate the disabled employee." 180 F.3d at 1178. If, as the majority contends, the *McDonnell Douglas* "framework enables the plaintiff to prove her claim in its entirety," Maj. Op. at 16, it would be reasonable to expect—as I maintain—that the adapted version of this framework that *Smith* employed also permitted the employee in that case to prove *in its entirety* his failure-to-accommodate claim. And, yet, the *Smith* court's recitation of the requisite elements of a prima facie case of a failure-to-accommodate claim made no mention of an adverse-employment-action element. Why? The answer should be quite clear by now—because, under our precedent, there is no such element in a failure-to-accommodate claim.

[6]     Lest there be any doubt that *Smith* intended its discussion to be comprehensive, it bears noting that the panel went on to discuss the employer's proof burden if the employee successfully established its prima facie case and what the

-10-

*Bartee*'s analysis forcefully suggests a similar conclusion.  There, it is very significant that we juxtaposed the elements of an ADA discrimination claim based on a disparate-treatment theory with the elements of such a claim based on a failure-to-accommodate theory.  *See* 374 F.3d at 912 n.4.  And we indicated that the element in the former of an adverse employment action (i.e., the employer's discharge of the employee because of his disability) was *satisfied* in the employee's "prima facie failure to accommodate claim" by the employer's failure to reasonably accommodate the employee's disability by placing him in a different job.  *Id.*  Under these circumstances, it would strain credulity to contend—as the majority, in effect, does—that, while conducting this failure-to-accommodate analysis that expressly elides an adverse-employment-action element, the *Bartee* panel nevertheless tacitly understood that any statement of *all* of the requisite elements of a failure-to-accommodate claim *necessarily* must include an adverse-employment-action element.  We should not accept such an implausible contention.

An appellate court that effectively declares that it is delineating the elements of "a prima facie failure to accommodate claim," as we have—*Bartee*, 374 F.3d at 912 n.4; *see Smith*, 180 F.3d at 1179—and then excludes (as the majority would have it) an ostensibly essential element of that claim (i.e., an adverse-employment-action requirement) would be running the serious risk that the lower courts and the public, if not the parties, would

_____

employee ultimately needed to demonstrate to survive an employer's summary-judgment motion.  *Smith*,  180 F.3d at 1179.  In this extended discussion, there is no mention of an adverse-employment-action element.

-11-

be misled about the contours of the law.  And I am not inclined to believe that my colleagues in our previous failure-to-accommodate cases would have been so cavalier.  Therefore, I respectfully decline to be moved by the majority's misguided efforts to find meaning from silence.

For the foregoing reasons, I respectfully dissent.  I would reverse the district court's judgment and remand for a new trial.[7]

---

[7]    Even if the question of whether an ADA failure-to-accommodate claim includes an adverse-employment-action element were actually an open one in this circuit (which it is not), I would have little reason to endorse the majority's textual analysis—that is, the majority's suggestion that § 12112(a)'s language regarding "other terms, conditions, and privileges of employment" is a "shorthand" for an adverse-employment-action requirement.  Maj. Op. at 14.  The majority's assertion to this effect only rests on a thin reed of authority from outside of our circuit.  For example, contrary to the majority's intimation, the Eighth Circuit in *Kelleher* did not scrutinize at all the meaning of the other-terms-conditions-privileges language, but instead predicated its analysis on the district court's and the parties' agreement that the ADA disparate-treatment and failure-to-accommodate claims at issue could be *conflated and addressed as one claim.  Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 & n.4 (8th Cir. 2016) ("Kelleher included her disability discrimination claim and her 'failure to continue to accommodate' claim as Counts 1 and 2, respectively, in her first amended complaint, but the district court addressed those claims as a single failure to accommodate claim.  On appeal, Kelleher also *treats them as a single claim, and we will do the same*." (emphasis added)).  As we have seen, however, such an agreement regarding the conflation of the two claims was misguided because these claims have distinct elements; in particular, the disparate-treatment claim has an adverse-employment-action requirement and the failure-to-accommodate claim does not.  As for the D.C. Circuit's *Marshall* decision, the court does make an observation seemingly helpful to the majority's position: "As the language of § 12112(a) makes clear, for discrimination (including denial of reasonable accommodation) to be actionable, it must occur in regard to some adverse personnel

-12-

decision or other term or condition of employment." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997).  But the court makes this observation without citation to further authority or even further discussion, and it does so—not in the context of resolving the merits of an ADA failure-to-accommodate claim—but,  rather, in connection with rendering a holding regarding administrative exhaustion. *See id.* at 1098–99.  In sum, this thin reed of marginally relevant authority has little power to persuade and, more specifically, would not make me inclined to endorse the majority's "shorthand" theory—i.e., its view that § 12112(a)'s language regarding "other terms, conditions, and privileges of employment" is a shorthand for an adverse-employment-action requirement.